UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,          HON. JUDITH E. LEVY
                                   CASE NO. 14-20699
          Plaintiff,               USM: 55316-039
Vs.

JOHN BARNES,

          Defendant.

_____/

## MOTION FOR REDUCTION OF SENTENCE
## Compassion to Release

John Barnes, by and through his attorney, Steven Scharg,

respectfully moves this court pursuant to 18 U.S.C. Section

3582(c)(1)(A) to modify Mr. Barnes' term of incarceration to time

served and to impose a special condition that he serve a period of home

confinement on supervised release.  Such a modification will effectively

allow him to finish the remaining time of his prison sentence

on home confinement, which will in turn allow him to protect himself

from the spread of the novel coronavirus  2019 ("COVID-19") by

sheltering in place at his residence as opposed to being infested at one

of the worst BOP facilities, FCI McKean.  Mr. Barnes has horrible

health  concerns of prostate cancer that was diagnosed in 2018, and had

1

surgery prior to going into custody.  However, his physicians found

additional cancer cells but Mr. Barnes was unable to be treated due to

his mandatory surrender date.  Mr. Barnes was also diagnosed with an

enlarged heart and as a result of both issues, he is concerned that it may

affect E. him if contacted by the COVID-19.

## I.     Introduction

On January 17, 2017, Mr. Barnes was arraigned on a second

Superseding Information on one Count of Possess with Intent to

Distribute One Kilogram of Heroin.  On March 22, 2017, Mr. Barnes

plead guilty without a Rule 11 Plea Agreement and was sentenced on

March 1, 2018, to 60 months and 60 months supervised release.  Mr.

Barnes was given a number of adjournments to self-report due to his

surgery for prostate cancer and then began his sentence on or about

May 20, 2019, at FCI McKean.

## II.     Discussion

**a.  The First Step Act (FSA) does not require mandatory administrative exhaustion for motions for reduction of sentence pursuant to 18 U.S.C. Section 3582(c)(1)(A).**

**1.  The plain text of the FSA gives courts power to consider a motion for reduction in sentencing without requiring full administrative remedies.**

The FSA's compassionate release provision grants the sentencing court the power to reduce a prisoner's sentence in two circumstances: when "(i) extraordinary and compelling reasons warrant such a reduction," or "(ii) the defendant is at least 70 years of age" and meets other criteria.  The statutory text does not require exhaustion of administrative remedies in all contexts.  Instead, it permits courts to modify a term of imprisonment once it has been imposed:

> (1)    in any case---
>
> (A)... the court, upon motion of the Director of the Bureau of Prisons or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt  of such a request by the warden of the defendant's facility, whichever is earlier...

18 U.S.C. Section 3582(c)(1)(A).

This language does not make exhaustion of administrative remedies mandatory.  The plain text gives the Court power and authority to reduce a sentence even without exhaustion of remedies in those contexts.  The Court has such power whenever the Director of the Bureau of Prisons makes the motion or "lapse of 30 days from the receipt of [a] request by the warden of the defendant's facility..." *Id.*

The question then is whether the courts have the power, in light

3

of the COVID-19 pandemic, to create an exception to either of these exhaustion provisions set by Congress.

The Supreme Court has held repeatedly that the court's power to create exceptions to a statutory exhaustion requirement depends on the language of the statute. "[A] statutory exhaustion provision stands on a different footing [from a judicially created one]. There, Congress sets the rules---and courts have a role in creating exceptions only if Congress wants them to." *Ross v Blake,* 136 S.Ct. 1850, 1857 (2016).

In the Prison Litigation Reform Act of 1995 (PLRA) cases, such as Ross, the Supreme Court ruled that courts do not have the power to create emergency exceptions to the exhaustion requirement where Congress created a mandatory requirement. The Court reached this conclusion because the PLRA used mandatory language in setting out the administrative remedies exhaustion standard. "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility *until such* administrative remedies as are available are exhausted." *Ross,* 136 S. Ct. at 1856; 42 U.S.C. Section 1997e(a)(emphasis added). The Supreme Court focused on the "no action shall be brought ...until" language in the PLRA. "[T]he PLRA's text

4

suggests no limits on an inmate's obligation to exhaust –irrespective of any special circumstances." *Id.*; see also *Woodford v Ngo,* 548 U.S. 81, 84 (2006)(proper exhaustion of administrative remedies is necessary). Given this mandatory language, the Court concluded "mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account." *Id.*

In contrast, the FSA's language has nothing akin to the type of mandatory language found by the *Ross* court to be controlling.  In fact, the text of the statute simply allows for the passing of time of 30 days, regardless of progress on administrative procedures.

The courts' power under Section 3582(c)(2) also supports this view that administrative exhaustion is not jurisdictionally required. Subsection (c)(2) is another provision that grants courts the power to "reduce the term of imprisonment."  In subsection (c)(2), the court may act "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. Section 994(o)""after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with

applicable policy statements issued by the Sentencing Commission...."
3482(c)(2).  The Circuits have found that the district courts have
jurisdiction to consider the motion to reduce sentence because the
courts are empowered generally to have jurisdiction over federal
criminal cases.  In other words, section 3582(c) is not the source of the
court's jurisdiction.  See *U.S. v Taylor,* 778 F.3d 667, 671 (7th Cir.
2015)("[Section] 3582 is not part of a jurisdictional portion of the
criminal code but part of the chapter dealing generally with sentences of
imprisonment...[n]or is subsection (c) phrased in jurisdictional terms.");
see also *U.S. v Calton,* 900 F. 3d 706, 710-11 (5th Cir. 2018) (citing *U.S. v
Caraballo-Martinez,* 866 F. 3d 1233, 1243 (11th Cir. 2017); *U.S. v May,*
855 F. 3d 271, 274-75 (4th Cir. 2017); *U.S. Trujillo,* 713 F. 3d 1003, 1005
(9th Cir. 2013) see also *U.S. v Green,* 886 F. 3d 1300, 1306 (10th Cir.
2018) (rejecting claim of jurisdictional bar).  Accordingly, Section
3582(c) generally should not be understood to impose jurisdictional
prerequisites related to exhaustion.

**2.  The legislative history of the FSA also supports the
conclusion that courts have the power to grant
compassionate release without requiring full administrative
exhaustions.**

The *Ross* Court also looked at the history of the PLRA to assess

whether Congress intended the statutory language to be mandatory. The Court found the PLRA's history "underscores the mandatory nature of its exhaustion regime" because the PLRA replaced a predecessor "statutory scheme [that] made exhaustion in large part discretionary" and "substituted an invigorated exhaustion provision" *Id.* 1857-58. The PLRA statutory language includes a qualifier: "the remedies must indeed be available to the prisoner." *Id.* Thus, the *Ross* Court remanded the case for further consideration of whether the prisoner had "available" remedies to exhaust. *Id.* at 1862. It did so because the statutory language stated that exhaustion was required "as [administrative remedies] are available…" *Id.* at 1856, 1862; 42 U.S.C. section 1997e(a).

In contrast, Congress's amendments to the compassionate release portion of the FSA were in response to the BOP's failure to "properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." U.S. Dept Justice, The Federal Bureau of Prisons Compassionate Release Program, p. 11 (2013); see generally Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. Section 3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration,* 21 Fed. Sent'g Rep. 167 (2009); Shon Hopwood, *Second Looks & Second Chances,*

41 Cardozo L. Rev. 83 (Oct 2019).

The changes made to section 3582(c)(1)(A) were intended to reform sentencing decisions and increase the use of the "compassionate release" provisions that already existed. The purpose of those amendments permitting prisoners to file a motion for a reduction in sentence with a court was *intended to increase the use* of that mechanism. The FSA entitled this section "Increasing the Use and Transparency of Compassionate Release." 164 CONG. REC. H10358 (daily ed. Dec. 20, 2018). Senator Cardin noted the First Step Act made several reforms to the federal prison system, including "expedit[ing] compassionate release applications." 164 CONG. REC. S7774 (daily ed. Dec. 18, 2018). Congressman Nadler noted that the FSA included "a number of very positive changes, such as ...improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 CONG. REC. H10361-H10362 (December 20, 2018).

### a. Exceptions to exhaustion found in administrative common law apply to the FSA

While Justice Breyer in *Ross* concurred with the majority's outcome, he wrote separately to remind us that the term "exhausted" in

administrative law includes "well-established exceptions to exhaustion." 136 S. Ct. at 1863 (citing *Woodford v Ngo,* 548 U.S. 81, 103 (2006)). Those exceptions include futility, constitutional claims, hardship, and the lack of adequate or available administrative remedies.  See also *Sims v Apfel,* 530 U.S. 103 (2000) (Breyer, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting)(recognizing futility and constitutional claims as exceptions); *Shalala v Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 13 (2000) (futility); *McKart v U.S.,* 395 U.S. 185, 197-201 (1969) (hardship); *McCarthy v Madigan,* 503 U.S. 140, 147-148 (1992) (inadequate or unavailable administrative remedies).

When the movant is facing irreparable harm and futility, courts have consistently waived exhaustion of administrative remedies. *Garza v Davis,* 596 F. 3d 1198, 1203-04 (10th Cir. 2010)(recognizing futility exception in context of Section 2241 petition), *Woodall v Federal Bureau of Prisons,* 432 F 3d. 235, 239 n. 2 (3d Cir. 2005))("{E}xhaustion would be futile, given that Woodall is not challenging the application of the BOP regulations, but their validity"); *Elwood v Jeter,* 386 F. 3d 842, 844, n. 1 (8th Cir. 2004); *Fournier v Zickefoose,* 620 F.Supp. 2d 313, 317 (D. Conn. 2009); *Boucher v Lamanna,* 90 F. Supp. 2d 883, 887 (N.D. Ohio

2000)(concluding that exhaustion of administrative remedies would be futile where the BOP's policy on categorizing the prisoner's offense as a violent crime was mandatory, the issue was a legal one that the BOP had consistently defended, and the potential for immediate release counseled timely consideration of the petitioner's case); see also *Chevrier v Marberry,* 2006 WL 3759909, *2-3 (E.D. Mich. Dec. 20, 2006); *Cushenberry v. Federal Medical Center,* 530 F. Supp 2d 908, 912 (E.D. Ky. 2008); *Zucker v Menifee,* 2004 WL 102779, *4 (S.D. N.Y. Jan. 21, 2004); *Snyder v Angellini,* 2008 WL 4773142, *2 (E.D.N.Y. Oct 27, 2008); *Ross v Fondren,* No. 08-325, 2008 WL 4745671 (D. Minn. Oct 29, 2008); *Kelly v Daniels,* 469 F. Supp. 2d 903, 904 (D. Or. 2007); *Scott v Lindsay,* 2007 WL 2585072, at *2(E.D.N.Y. Sept 10, 2007).

In the compassionate release context in particular, courts have recognized that under the right circumstances, seeking relief from BOP can be futile, and so, exhaustion of administrative remedies is waived. *Thody v Swain,* 2019 U.S. Dist. Lexis 226582, *5 (C.D. Ca. Nove. 26, 2019) (citing *Fraley v United States Bureau of Prisons,* 1 F. 3d 924 (9th Cir. 1993)(where administrative appeal to Regional Director certainly denied request based on BOP policy, further application for administrative remedies would be futile));*Merth v Puentes,* 2019 U.S.

10

Dist. LEXIS 114799, *8 (E.D. Ca. July 10, 2019)(holding administrative exhaustion of FSA's good time credits provision futile and so waived). Cf *U.S. v Mills,* 2019 U.S. Dist. LEXIS 10954, *3 (M.D. Fl. January 23, 2019)(prisoner cannot invoke futility of administrative remedies when he requested compassionate release before the enactment of FSA).

These conclusions are also supported by other provisions in the FSA.  Specifically, the Act carves out notice and expedited administrative consideration for prisoners with terminal illnesses.  18 U.S.C. Section 3582(d).

Both the language of the FSA and the legislative history support the conclusion that full exhaustion of administrative remedies is subject to exceptions and it is not mandatory.

**B.  Mr. Barnes is excused from exhausting his administrative remedies because the BOP does not have any policy in place to consider requests based on COVID-19, so any such request would be futile**

To date, the BOP's response to the COVID-19 pandemic has not included the urgent identification and consideration for early release those prisoners who are at a higher risk from this disease.  See Federal Bureau of Prisons COVID-19 Action Plan,

https://www.bop.gov/resources/news/2020313_covid-19.jsp (March

13, 2020); "Disaster waiting to happen:  Thousands released as jails and

prisons face coronavirus threat" (Washington Post March 25, 2020)

noting that federal authorities have not developed any emergency

policies for release on the basis of COVID-19).[1]  FCI Elkton has been hit

hard by the virus.  It is the number one prison affected by COVID-19.

FCI McKean has also been another federal institution having extreme

problems from the virus.   Therefore, even if Mr. Barnes had a

designated officer with authority to make an administrative

determination in his case, making such a request for urgent

compassionate release based on the COVID-19 pandemic would likely

be futile because BOP's policy response does not currently include any

emergency or urgent consideration of early release or the

recommendation for a reduction in sentence on the basis of the COVID-

19 pandemic.  Since BOP has not created an emergency administrative

remedy for prisoners at serious risk from COVID-19, seeking such

urgent administrative relief constitutes an exception to the exhaustion

requirement on the basis of futility.  See *Fletcher v Menard Correctional*

---

[1] https://www.washingtonpost.com/national/disaster-waiting -to-happen
thousands-of -inmates-released-as-jails-face-coronavirus-
threat/2020/03/24/761c2d84-6b8c-11ea-b313;
df458622c2cc_story.html?utm_campaign=wp_post_most&utm_medium+email&utm
_source+newsletter&wpisrc=nl_most.

*Center,* 623 F. 3d 1171, 1174 (7th Cir. 2010)("If it takes two weeks to exhaust a complaint that the complainant is in danger of being killed tomorrow, there is no possibility of some relief and so nothing for the prisoner to exhaust").

### C.   A reduction of sentence to home confinement is warranted in this case because of the extraordinary and compelling reasons related to Mr. Barnes' risk of exposure and death from COVID-19

Congress did not define what would constitute an "extraordinary and compelling reason" warranting a reduction of sentence under Section 3582(c).  Indeed, the legislative history confirms that in intended to grant federal sentencing courts broad discretion to make those determinations on a case-by -case basis and to reduce fundamentally unfair sentences where such reasons exist.

Congress's initial goal in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system."  S. Rep. No. 98-225, at 52, 53 n. 74 (1983).  But with the elimination of parole as a corrective measure in cases where early release is warranted, Congress recognized the need for an alternative review process.  It therefore, allowed for judicial reduction of certain sentences under Section 3582(c):

The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances.  These would include cases of severe illness, cases in which *other extraordinary and compelling circumstances* justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment. *Id.* at 55-56 (emphasis added).

Put differently, rather than having the Parole Commission review every federal sentence, Congress decided to let sentencing courts decide, in a far narrower band of cases presenting extraordinary and compelling circumstances, if "there is a justification for reducing a term of imprisonment." *Id.* at 56.

The situations listed in Section 3582(c) were thus intended to serve as "safety valves for modifications of sentences, "enabling sentence reductions when justified by factors that previously could have been addressed through the (now abolished) parole system. *Id.* at 121. This approach was intended to keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, and permitted "later review of sentences in particularly compelling situations." *Id.*   Notably, Congress imposed no limitations on courts' authority to make such determinations, declining to define what

constitutes "extraordinary and compelling reasons" or to otherwise constrain judges' discretion.  The mandate was simple: if extraordinary and compelling circumstances were present, they would "justify a reduction." S. Rep No. 98-225, at 55-56 (1983).

Following the First Step Act's passage, courts have held that they are vested with discretion to find "extraordinary and compelling reasons" for a reduction in sentence that go beyond the technical requirements set forth in BOP regulations and USSG Section 1B1.13, applications note 1 (setting forth such "extraordinary and compelling reasons" as "terminal illness" and a guideline range that a prisoner over 65 years old should be released early when he has "served at least 10 years or 75 percent of his sentence").  See *U.S. v Redd,* 2020 U.S. Dist. LEXIS 45977 at *7-12 (E.D. Va Mar. 16, 2020) (district courts vested with discretion to find "extraordinary and compelling reasons" beyond the technical requirements of the guidelines manual or BOP regulations); *Cantu,* 2019 WL 2498923, at *5; *Cantu-Rivera,* 2019 WL 2578272, at *2 n.1; *U.S. v Beck*, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019)("while the old policy statement provided helpful guidance, it does not constrain the Court's independent assessment of whether extraordinary and compelling reasons warrant a sentence reduction

under Section 3582(c)(1)(A)(i).").

COVID-19 has spread throughout the United States, infecting thousands of Americans and inflicting many with severe respiratory illness; many Americans have perished.  On March 11, 2020, the World Health Organization described the COVID-19 outbreak as a global pandemic.  COVID -19 poses a fatal risk to people 60 years of age and older and those with preexisting conditions, especially those with compromised lung diseases.

Mr. Barnes is 51 years old and suffers from prostate cancer, an enlarged heart, and additional cancer issues that were not addressed prior to going into custody.  He is in a high-risk category of individuals who face grave health consequences or death from exposure to COVID-19.  His cancer did not develop while he was incarcerated, he was being treated for the cancer just prior to surrendering at FCI MCKean.  Upon information and belief, his cancer was noted by the presentence interviewer.  Prior to surrendering, his medical information was provided to the Court and Assistant U.S. Attorney.

Mr. Barnes has also indicated that there are inmates dying at FCI McKean daily from COVID-19 and he is extremely concerned because of

his cancer and at a high risk of catching the virus.  The prison is letting inmates leave that are non-violent if the Court orders the defendant to be released to home confinement.  Mr. Barnes does have a period of time left in his sentence.  While in custody, Mr. Barnes works in the kitchen and with the dog program.  He hasn't received any violations since being in-custody.  Mr. Barnes has completed all RPP classes and also the drug education class.

However, while on bond, he was very cooperative with the government and law enforcement.  While on bond and supervised by Pretrial Service, Mr. Barnes was consistently employed with legitimate employment and did not violate his bond conditions set by the Court. Mr. Barnes does have suitable living arrangements available for the probation department to review prior to being released from custody. Mr. Barnes would reside with his wife and children at 45578 Fountain View Drive, Canton, Michigan 48188.

Jurisdictions around the country have begun releasing prisoners susceptible to COVID-19 exposure with an appreciation that it is impossible to practice social distancing or isolation in a prison setting, and that the pandemic will be devastating when it reaches prison

populations.[2]   That includes releases of prisoners at the very same

facility where Mr. Barnes is located.

Courts are beginning to recognize the risks as well.  On March 18,

2020, in *United States v Stephens*, 15-cr-95 (AJN)(S.D.N.Y. Mar. 18,

2020), Judge Alison J. Nathan granted the defendant's emergency

motion for reconsideration of denial of bail and ordered the defendant

released with conditions. *Id.,* Doc. 2798.  Judge Nathan noted that, since

the initial bail hearing, "the unprecedented and extraordinary

dangerous nature of the COVID-19 pandemic has become apparent" and

that while "there is not yet a known outbreak among the jail and prison

populations, inmates may be at a heightened risk of contracting COVID-

19 should an outbreak develop." *Id.* at 2 (citing Joseph A. Bick, Infection

Control in Jails and Prisons, 45 Clinical Infectious Diseases 1047, 1047

(Oct 2007)).  Judge Nathan further noted that "[t]he magnitude of this

risk has grown exponentially since the [prior hearing] before this Court;

---

[2]See, e.g. L.A. County Releasing Some Inmates from Jail to Combat Coronavirus, L.A. Times, March 16, 2020, available at:
http://www.latimes.com/california/story2020-03-16/la-jail-population-arrests-down-amid-coronavirus; NYC Board of Correction Calls on City to Begin Process of Releasing Certain Prisoners in Response to COVID-19, Sentencing Law and Policy blog, available at:
http://sentecing.typepad.com/sentencing_law_and_policy/2020/03/nyc-board-of-correction-calls-on-city-to -begin-the-process-of-releasing-certain-prisoners-asap-in-re.html.

at the end of the day on March 6, New York State had 44 confirmed cases of COVID-19, but that by the end of the day on March 18, that number had climbed to 2,382." *Id.* at 2-3 (citations omitted).  In her order, Judge Nathan also cited a recent bail determination in the Eastern District of New York, *United States v Rathan,* 20-cr-68 (BMC)(E.D.N.Y. Mar. 12, 2020), where Judge Brian M. Cogan ordered a defendant released on bail in part because "[t]he more people we crowd into [the MCC], the more we're increasing the risk to the community." *Id.*, Doc. 20 at 10.

Our legislators also now recognize the significant health risks that inmates face as a result of COVID-19.  Congresspersons Jerold Nadler and Karen Bass have separately written to Attorney General William P. Barr to note that "it is incontrovertible that, if [DOJ} does not act aggressively to address the COVID-19 threat, federal jails and prisons could quickly become epicenters of the COVID-19 pandemic."  See Letter from Rep. Jerold Nadler and Rep. Karen Bass to Attorney General Barr dated Mar. 19, 2020.[3]

Since then, the COVID-19 has spun out of control effecting thousands of people throughout the United States and throughout the

---

[3] https://judiciary .house.gov/news/documentsingle.aspx?DocumentID=2885

federal prison system.  So bad, Governors are executing orders that we

shouldn't even leave our homes other than for critical necessary things.

Just imagine in our prisons systems, there isn't enough room to

segregate the prisoners who are just the carrier of the COVID-19.  The

system is severely infected by the virus.

Therefore, Mr. Barnes' circumstance as a 51 year old man with

Prostate cancer and other issue cancer issues constitutes "extraordinary

and compelling reasons" within the meaning of the FSA, and he

repeatedly asks the court to find that he qualifies for compassionate

release.

### F.  A reduction in sentence is warranted     considering the other sentencing factors

In determining whether Mr. Barnes' sentence should be

reduced, the court must decide, inter alia, whether he presents a danger

to the safety of any other person or to the community as provided in 18

U.S.C. Section 3142(g) and USSG Section 1B1.13(2).  If he does not, the

court should then look to the factors outlined in 18 U.S.C. Section

3553(a).  All these factors weigh strongly in favor of release in his case.

Mr. Barnes does have older felony convictions however, he is not

a danger to the community.  However, he has one son and two step-

children.   Mr. Brown always found employment and was working full-

time as a car salesman for one of the dealerships in this area and was

taking care of his children financially.

Mr. Barnes accepted responsibility for his non-violent crime and

has expressed explicit, repeated and sincere remorse.  The punishment

he received is sufficient to deter any future misconduct.  Mr.

Barnes did follow the Court's orders while being supervised by

pretrial services so it would not be any issue if Mr. Barnes is sentenced

to home confinement.  It is imperative that he avoid any contact with

individuals carrying the COVID-19 because it could be fatal to Mr.

Barnes due to his illnesses.  **Mr. Barnes was contacted by the**

**warden's staff  to be placed on the list to be released but has not**

**received any notification of that happening.**


### III.   Conclusion

With the passage of the First Step Act, Congress emphasized the

imperative of reducing unnecessary incarceration and avoiding unduly

punitive sentences that do not serve the ends of justice.  *United States v*

*Simons,* 2019 WL 1760840, at *8 (E.D.N.Y. April 22, 2019).  Mr. Barnes

asks for the mercy of the court to allow him to self-isolate during this pandemic.  He repeatedly requests that the court take this opportunity to grant a reduction in his sentence based on extraordinary and compelling reasons and reduce his sentence to time served.  The government objects to our request.

Respectfully submitted,


s/Steven Scharg
STEVEN SCHARG (P43732
Attorney for Defendant Barnes
615 Griswold, Suite 1125
Detroit, Michigan 48226
(313) 300-0214
Scharg1924@gmail.com

Dated:  May 13, 2020

CERTIFICATE OF SERVICE

I certify that on May 13, 2020, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF System, which will notify

Assistant U.S. Attorney, Mark Bilkovic at:

mark.bilkovic@usdoj.gov

Respectfully submitted,

s/Steven Scharg
STEVEN SCHARG (P43732
Attorney for Defendant Barnes
615 Griswold, Suite 1125
Detroit, Michigan 48226
(313) 300-0214
Scharg1924@gmail.com

Dated:  May 13, 2020