# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                     Case No. 14-20699

v.

                                     Hon. Judith E. Levy

JOHN BARNES,

      Defendant.

---

| | |
|---|---|
| Mark Bilkovic | Wade G. Fink (P78751) |
| Assistant United States Attorney | WADE FINK LAW PC |
| 211 W. Fort St., Ste 2001 | 370 E. Maple Rd., Third Floor |
| Detroit, Michigan 48226 | Birmingham, Michigan 48009 |
| (313) 226-9583 | (248) 712-1054 |
| marc.bilkovic@usdoj.gov | wade@wadefinklaw.com |
| *Attorneys for the United States* | *Attorneys for John Barnes* |

---

## DEFENDANT'S SUPPLEMENTAL BRIEF

## I.      BACKGROUND

On May 13, 2020, through counsel, Defendant John Barnes ("Barnes") filed his first motion for compassionate release. ECF No. 87. The majority of this initial motion focused on legal arguments related to exhaustion, which was later mooted by *United States v Alam,* No. 20-1298 (6th Cir. 2020), decided a few weeks later. Barnes' counsel cited Barnes' age, cancer history, and enlarged heart as reasons warranting compassionate release. ECF No. 87, Page.ID 409. This Court denied

Barnes' first compassionate release motion on June 2, 2020, but invited another motion if circumstances warranted. ECF No. 93.

Taking that invitation, on October 13, 2020, Barnes wrote and filed an impressive *pro se* reconsideration motion focusing on the scientific research on COVID-19 and its effect on the heart. ECF No. 96, PageID.530. The Court construed this motion as a second motion for compassionate release and ordered the government to respond. ECF No. 97. The government responded with much of the same language that it has used in many other compassionate release cases. But it also argued that Barnes' age and heart condition are not extraordinary and compelling circumstances warranting compassionate release. ECF No. 101, PageID.546. With regard to Barnes' heart condition, the government's position is that a federally incarcerated inmate - during a global pandemic - is responsible for locating prior medical records documenting the condition, executing proper waivers, and presenting it to this Court timely. *Id.* at 547.

A hearing was held on November 19, 2020.[1] At the hearing, this Court raised the issue of Barnes' Body Mass Index ("BMI"), 33, which renders Barnes medically

---

[1] Undersigned counsel has not had an opportunity to order or review a hearing transcript. However, undersigned counsel is confident that such would be unnecessary in writing this supplement on the discrete issues presented and because the written record is robust.

obese. The government was granted an opportunity to file a supplemental brief on this topic, which is did on November 30, 2020. ECF No. 108.

In its supplement, the government concedes that a BMI of over 30 is considered medically obese, but then, in nothing short of a baseless personal attack, argues that Barnes' "skinfold thickness," eating habits, and other things must be evaluated to determine whether Barnes' BMI actually poses a health risk. ECF No. 108, PageID.711. Related to obesity, the government argues, in short: (1) obesity alone is insufficient for compassionate release and (2) a lack of self-control by obese people does not warrant compassion. Lastly, the government also argues that Barnes should also be denied compassionate release because he failed to participate, so far, in the Residential Drug Addiction Program ("RDAP") and because Barnes has some sort of admittedly minor infraction on his prison record, which he failed to disclose at the hearing. *Id.* at PageID.717-720.

The Court then ordered Barnes be appointed counsel and for counsel to respond to two discrete issues raised by the government:

1. Whether Defendant's current BMI of 33 alone is a sufficient risk factor justifying compassionate release; and

2. Whether Defendant's § 3553 factors counsel against compassionate release, particularly in light of Defendant's refusal to participate in the RDAP program as suggested by the Court in Defendant's March 2018 judgment.

ECF No. 106, PageID.707.

3

The undersigned was assigned the case and this brief follows.

## I.    ARGUMENT

**A. Obesity, Alone, Justifies Compassionate Release.**

The science is clear: obesity is likely the single biggest risk factor, outside of age, that is predictive of not only severe disease, but also predictive of *contracting* COVID-19. Accordingly, obesity, standing alone, justifies compassionate release.

As the government and this Court are aware, since the beginning of the pandemic, the CDC has recognized a BMI of 40 or more as substantially increasing risk for severe disease and poor outcomes. However, obesity is so dangerous in this context, that the CDC issued updated guidance in June lowering the threshold number to a BMI of 30 or higher.[2] Thus, with a BMI of about 33 kg/m$^2$, Barnes is considered medically obese and is at substantially increased risk for severe COVID-19 according to the CDC and medical data.[3] In fact, the CDC is explicit, noting that a BMI greater than 30 is one of the risk factors supported by the strongest and most consistent evidence.[4]

---

[2] *CDC Updates, Expands List of People at Risk of Severe COVID-19 Illness*, (Jun. 25, 2020), https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html

[3]                                    Body                    Mass                    Index, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm

[4] *Evidence Used to Update the List of Underlying Medical Conditions that Increase a Person's Risk of Severe Illness from COVID-19*, Centers for Disease

The underlying data is undeniable. On August 26, 2020, a peer-reviewed study of 399,000 patients found that people "with obesity who contracted SARS-CoV-2 were 113% more likely than people of healthy weight to land in the hospital, 74% more likely to be admitted to an ICU, and 48% more likely to die."[5] Indeed, a "constellation of physiological" factors underlie these numbers. *Id.* Biological factors that lead to increased risk when obese include impaired immunity, chronic inflammation, and blood clotting tendencies.

Neveed Sattar, an expert in cardiometabolic disease at the University of Glasgow, explains that obesity "seems to be a linear line, straight up" in terms of severe disease. *Id.* And critically, one need not be morbidly obese but merely obese by medical standards. Another study of 334,000 patients in England demonstrated that the risk *peaked* at a BMI of 35, increasing the risk of many people who may not realize they have tipped into overweight territory.[6]

---

Control (updated Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html

[5] *Why COVID-19 is more deadly in people with obesity – even if they're young*, Pulitzer Center and Heising-Simons Foundation, http://www.sciencemag.org/news/2020/09/why-covid-19-more-deadly-people-obesity-even-if-theyre-young

[6] *Overweight, obesity, and risk of hospitalization for COVID-19: A community-based cohort study of adults in the United Kingdom*, Mark Hamer et al, Proc Natl Acad Sci USA 2020, pubmed.ncbi.nlm..nih.gov.

In asking counsel to address this issue, particularly obesity as a standalone condition, counsel found it helpful to understand why obesity plays such a devastating role in severe disease. A part of it is simple body mechanics: fat pushes the diaphragm into the lungs and restricts airflow; restricted airflow collapses airways in the lower lung so a person is less oxygenated; fat cells "infiltrate organs where immune cells are produced and stored" so the body is less effective at fighting disease; and, because immune cells "don't function [] well in an obese state," in turn, there is an inability to have an effective immune system. This is borne out in research showing that obese people respond worse to some vaccines. *See* fn. 5, 6. These latter reasons also explain why you are more *susceptible* in the first place, because you have a worse immune response than a person at a healthy weight.

The government's first argument on the topic of obesity is that this Court should not grant compassionate release because obesity, alone, is not a compelling and extraordinary circumstance. The boldness and ease with which the government changes positions would be the envy of many politicians. Indeed, the government's position here is wholly inconsistent with its concessions in hundreds of other cases nationwide - dozens in this district. In these cases, the government has conceded that a BMI over 30 is an extraordinary and compelling circumstance justifying compassionate release. *See, e.g., United States v. White*, No. 18-20183, 2020 U.S. Dist. LEXIS 231112, at *5 (E.D. Mich. Dec. 9, 2020) ("The government concedes

that . . . the defendant's obesity qualifies as a recognized serious medical risk factor"); *United States v. Hill*, No. 16-20772, 2020 U.S. Dist. LEXIS 231129, at *11 (E.D. Mich. Dec. 9, 2020) ("The government does not dispute, and federal courts regularly have held, that obesity poses a sufficient medical risk to establish extraordinary circumstances weighing in favor of release, at least where the inmate is confined at a facility with an active COVID-19 outbreak"). The government should be held to its concessions in cases as recent as two weeks ago, as such is only fair for equal treatment.

But even if the analysis does not end there, the government's position that other co-morbidities must be present along with obesity to justify compassionate release is not based in law. And it is not even the facts here. Barnes *does* have other risk factors – his age and his heart.

There is no requirement in law or in fact that an obese person must present with other conditions to be at higher risk for severe COVID-19. None of the data cited here is co-dependent on other co-morbidities. No Court has announced such an absolute requirement for compassionate release, either. In fact, obesity is quite often the dispositive factor in these cases. *See, e.g., United States v. Henderson*, No. 2:99-cr-00214-1, 2020 U.S. Dist. LEXIS 231771, at *10 (S.D. W. Va. Dec. 10, 2020) ("numerous courts have found that, in light of the COVID-19 pandemic that obesity may qualify as a compelling reason for compassionate release")

(collecting cases); *United States v. Oluwamuyiwa Abolad Olawoye*, No. 1:15-cr-00172-AA-5, 2020 U.S. Dist. LEXIS 141637, at *10-11 (D. Or. Aug. 7, 2020) ("**Even without the presence of other health conditions,** obesity alone is the 'most significant risk factor, after only older age, for being hospitalized with Covid-19.'") (emphasis added); *United States v. Welch*, No. 2:07-cr-394-MHH-JHE-1, 2020 U.S. Dist. LEXIS 238524, at *12 (N.D. Ala. Dec. 18, 2020) ("District courts [] have concluded that obesity is a comorbidity justifying compassionate release because of the heightened risk that COVID-19 poses to obese prisoners") (collecting cases).

The evidence "indicates that obesity is strongly and independently associated with adverse outcomes of COVID-19, including death."[7] Obesity plays a profound role in risk for death from COVID-19, particularly in . . . younger populations" and identifying severe obesity as "a target for early intervention"[8]

But even so, obesity is not standing alone here. Barnes does have other risk factors. He is 51 years old and claims to have a structural defect with his heart. With regard to age, the CDC recognizes that every one-year increase in age makes an

---

[7] Sam M. Lockhart & Stephen O'Rahilly, *When Two Pandemics Meet: Why is Obesity Associated with Increased COVID-19 Mortality?*, MED (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7323660/pdf/main.pdf

[8] Sara Y. Tartof, et al., *Obesity and Mortality Among Patients Diagnosed with COVID-19: Results From an Integrated Health Care Organization*, Annals of Internal Medicine (2020), https://www.acpjournals.org/doi/pdf/10.7326/M20-3742

individual more susceptible to serious complications should they contract COVID-19. The CDC no longer cabins increased risk based on age to solely those above 65. The CDC's recently updated guidelines instead warn that "among adults, risk increases steadily as you age" and states that recent data shows that "the older people are, the higher their risk of severe illness from COVID-19."[9]

In fact, in an affidavit before another Court in this district, Dr. David Willens, a division head of internal medicine at Henry Ford Hospital, responsible for hundreds of COVID-19 patients, testified that another 51-year-old inmate was at higher risk solely because of his age. Specifically, he testified that "it is extremely clear that each one-year increase in age is an independent risk factor for more severe COVID. At the age of 51, [Defendant] is older than about 80% of the prison population so he is therefore at higher risk." *See United States v. Flenory,* Case No. 05-cv-80955 at ECF No. 1637-3, Affidavit of Dr. David Willens. At 51 years old, Barnes is older than 80.3% of the federal prison population, making him making him by definition higher risk than the vast majority of inmates in BOP custody.

Further, Barnes has raised the issue of an enlarged heart. This Court has agreed that Barnes' prior briefing is correct in that such a defect can increase risk for severe manifestations of COVID-19. ECF No. 97, Court's Order. To the extent the

---

[9] CDC Updates, *supra* note 2.

government places the burden on Barnes to provide more proof, to do so "would remove compassion from compassionate release." *United States v. Nygren*, No. 1:16-cr-00106-JAW, 2020 U.S. Dist. LEXIS 129493, at *38 (D. Me. July 22, 2020). It would be unfair and unrealistic to require a federally incarcerated inmate, in the middle of a pandemic, to procure outside medical records timely. It requires remembering, precisely, who made the diagnosis, contacting such from inside a prison, and providing proper waivers all in the time to avoid catching this deadly disease.

Undersigned counsel spoke with Mr. Barnes and his wife, Nico Jones, about their recollections of his heart diagnosis. Upon information and belief based on these conversations, within the last few years, Barnes went to the emergency room at Royal Oak Beaumont with chest pains. It was during this visit the defect was observed and he was supposed to follow up with a cardiologist. Barnes has forwarded to counsel the medical records he does have, but mail slowdowns have impacted receipt. To the extent there are relevant records, counsel will bring it to the court's attention. However, based on these representations and those made by Barnes, the Court must weigh Barnes' statements and proffer with regard to his enlarged heart. On balance, there is no reason to believe it is untrue.

The last argument the government makes about obesity is offensive and insulting. In short, the government argues that Barnes made himself overweight and

he must live with the consequences. The argument is precisely what led to the "drought of compassion" that the Sixth Circuit recently recognized. *See U.S. v. Jones,* ___ F.3d ____, No. 20-3701 (6ᵗʰ Cir Nov. 20, 2020). It is also emblematic of this District's United States Attorney and his inability to see the humanity in individuals. His policy has been to deny concurrence on every compassionate release motion. It is mean-spirited. This argument fits squarely with that policy. The policy leads to arguments like this. This is a new low.

The government writes that Barnes "does not appear interested in losing weight" and proceeds to list his recent commissary purchases that includes foods that are hardly even offensive (a few cookies and some chips for a man in federal prison and enduring months-long lockdowns). As a person who has struggled with his weight his entire life, the undersigned finds this argument to be a disgrace to the United States' seal. It embodies everything that the last few months of this Justice Department has become – one that started and continued executing federal prisoners for the first time in 17 years, even *after* the presidential election was decided, and one that continues to find rock bottom in its attempt to keep hundreds of older inmates in prison despite the dangers of COVID-19.

It would be interesting to hear government's counsel's view on overweight juvenile inmates. Juvenile obesity is at an all-time high. Should these children's lives be decided because a child ate "two pecan pinwheel" cookies?

Food addiction is real. Obesity is a medical condition. And the sharpness of undersigned's pen is intentional. The moralistic judgments by the AUSA here makes my skin crawl. A Maine District Court was equally appalled:

> Whatever the Government's counsel may think of obesity as a legitimate medical condition, it strikes the Court as inappropriate for the Government to imply that Mr. Nygren deserves his current enhanced risk to severe illness from the COVID-19 pandemic because obesity is, in the AUSA's personal opinion, a matter of Mr. Nygren's personal choice. Put another way, the Court rejects the Government's position that it should deny Mr. Nygren's petition and place him at risk of severe medical consequences, even death, because in the Government's moralistic view, he lacks sufficient self-control.

*Nygren*, 2020 U.S. Dist. LEXIS 129493 at *36-37. The Court continued:

> The CDC itself does not agree with the Government. The CDC describes adult obesity as a "complex health issue resulting from a combination of causes and individual factors such as behaviors and genetics." The CDC goes on to say that these "[b]ehaviors can include physical activity, inactivity, dietary patterns, medication use, and other exposures." *Id.* The CDC states that "[a]dditional contributing factors include the food and physical activity environment, education and skills, and food marketing and promotion." *Id.* The CDC does not state or imply what the Government is arguing here: that Mr. Nygren's obesity is simply a matter of his lack of will and discipline.

*Id.* (citations omitted).

A district court in New Jersey similarly wrote:

> The Government argues that Defendant's obesity is not an extraordinary and compelling reason for release because Defendant 'has offered no reason why he cannot reverse

or otherwise 'recover' from his obesity through proper diet and exercise,' and there is no indication that 'his obesity is not an irreversible side-effect of some other medical condition or medication.'. . . This argument is unconvincing. It ignores Defendant's inability to control what meals he is offered and what exercise regimen he can pursue (in the present circumstances, understandably curtailed). It puts on Defendant's shoulders responsibility for his obesity and the means of eliminating it as if this medical condition is regulated by simple will power. The Court rejects this based on common sense and the host of information readily available electronically and in print about the rate of obesity in the *unincarcerated* population of the United States. Here, what matters is that Defendant's medical condition places him on the CDC's list of people at increased risk of severe illness from COVID-19—a list which courts around the country have used as a guidepost for determining whether extraordinary and compelling reasons exist in COVID-19 compassionate release cases.

*United States v. Henderson,* No. 15-0329 (ES), 2020 U.S. Dist. LEXIS 156060, at *7-9 (D.N.J. Aug. 26, 2020).

In sum, the medical data related to obesity and COVID-19 overwhelmingly supports the conclusion that obesity, in itself, is a risk factor for severe manifestations of COVID-19. Further, obesity is not the only risk factor possessed by Barnes – he is older and has a heart defect. And last, the government's moralistic lectures about food addiction have no place, whatsoever, in this acute life or death discussion.

## B.  The Sentencing Factors Counsel in Favor of Release.

The government argues that Barnes' failure to enroll in the RDAP program in May of 2019 cuts against rehabilitation. The Court asked counsel to address this and its impact on the sentencing factors.

Barnes did not refuse to participate in RDAP. Barnes contends that when he discussed the RDAP program with his counselor, he was informed that the program would not be starting for several months after he applied and was accepted. He was adjusting to prison and his family was going through tremendous pain. Accordingly, after discussions with his counselor, Barnes decided that he would rather complete all of his "Ready for Release Program" classes ("RPP"), a drug education class, and the non-residential drug program rather than wait for the RDAP program to begin. He had a lot of time in prison. His plan was to complete these programs and then apply for RDAP. Such came with his counselor's blessing. After completing RPP, several drug classes and the three-month non-residential drug program, in about March of 2020, RDAP was no longer available as the pandemic began in earnest. Since, RDAP has been starting up again recently in some facilities, but not yet available to Barnes. This explanation is corroborated by Barnes' prison record and my discussions with Barnes with his counselor present.

Despite being unable to enroll in RDAP, Barnes' rehabilitative efforts thus far have not been insignificant. There has not been a time when Barnes was not actively

working towards bettering himself while incarcerated. He has worked a job of trust (kitchen duty) and is now working in the automotive garage. He has completed many classes, including drug classes. He still desires to participate in RDAP, as he views such as the capstone of his rehabilitation. And should he be released, he is willing to take a substantial and burdensome program if this Court requires as a condition of supervised release.

Numerous district courts have found similar efforts of other inmates to support early release. *United States v. Fernandez*, No. 12-CR-445-1 (JMF), 2020 U.S. Dist. LEXIS 93669, at *34 (S.D.N.Y. May 26, 2020) (emphasizing an inmate's participation in pre-release programs and the non-residential drug program in granting release); *United States v. Threet*, No. CCB-14-020, 2020 U.S. Dist. LEXIS 222410, at *6 (D. Md. Nov. 30, 2020) (releasing an inmate who "completed non-residential drug programming at the BOP, and will continue substance abuse treatment upon his release"); *United States v. Murphy*, No. 2:13-cr-00115-NT, 2020 U.S. Dist. LEXIS 143830, at *13 (D. Me. Aug. 11, 2020) ("Mr. Murphy's completion of the BOP's non-residential treatment program is particularly important" [and] "bodes well for his chances of success on supervised release"); *United States v. King*, No. 17-cr-20332, 2020 U.S. Dist. LEXIS 165451, at *16 (E.D. Mich. Sep. 10, 2020) ("King's dedication to bettering himself while incarcerated and his recognition

that he had an addiction to drugs and needed to seek treatment for that addiction suggest that it is unlikely that he will reoffend").

The RDAP program, and Barnes overall prison record, must be viewed as a whole. For this reason, as this Court is well-aware, in deciding what is "sufficient but not greater than necessary, to comply with the purposes of [sentencing]," § 3553(a) instructs a court to consider the following:

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(2)** the need for the sentence imposed—
>
>> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> **(B)** to afford adequate deterrence to criminal conduct;
>>
>> **(C)** to protect the public from further crimes of the defendant; and
>>
>> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> **(3)** the kinds of sentences available;
>
> **(4)** [the kinds of sentence and sentencing range provided for in the USSG]
>
> **(5)** any pertinent [Sentencing Commission policy statement]
>
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(**7**) the need to provide restitution to any victims of the offense

*United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418 at *7,

8  (E.D.N.Y. Apr. 10, 2020) (summarizing § 3553(a)).

The overriding factor under § 3553(a) that was not present at the time of

sentencing is the COVID-19 pandemic. Barnes acknowledges the serious nature of

his convictions, which qualified him for a considerable sentence. But at the same

time, Barnes' actions did not warrant a sentence that includes exposure to life-

threatening illness or death. *Tyler v. United States*, No. 4:12-cr-37, 2020 U.S. Dist.

LEXIS 171702, at *9 (E.D. Va. Sep. 18, 2020) ("Although Petitioner's original

sentence was lawfully imposed in accordance with the § 3553(a) factors, serious

illness and the potential for an accelerated death was decidedly *not* among the

reasons for it"); *Rodriguez*, 2020 U.S. Dist. LEXIS 58718 at *32 (noting that when

a defendant's sentence was imposed it "did not include incurring a great and

unforeseen risk of severe illness or death.").

For this reason, a sentence reduction in this one-in-a-lifetime pandemic would

not undermine the serious nature of the offense, nor the need for just punishment and

deterrence. No rational actor would look at compassionate release because of this

public health crisis and think that their crimes are less serious or that they will not

be punished. That would be an irrational conclusion. *United States v. Turner*, No.

18-CR-142, 2020 U.S. Dist. LEXIS 175572 (E.D. Wis. Sep. 24, 2020) ("to the extent

would-be drug traffickers pay attention to such matters, it is highly doubtful that the potential death of a child's care-giver and how 18 U.S.C. § 3582(c)(1)(A) might apply in that situation factors into the decision whether to break the law"); *United States v. Alam*, No. 15-20351, 2020 U.S. Dist. LEXIS 130118, at *18 (E.D. Mich. July 23, 2020) ("Alam's release will not produce unwarranted sentencing disparities because it accounts for his unique medical conditions in light of the COVID-19 pandemic).

Barnes has also demonstrated that he can be successful and respect the Court's conditions. Upon information and belief, Barnes was on bond without incident in this case and reported to prison without incident. *See United States v. Wren*, No. 10-cr-20137, 2020 U.S. Dist. LEXIS 156155, at *10 (E.D. Mich. Aug. 28, 2020) ("When the Court decided to release Wren on bond pending trial in 2010, it determined that conditions could be imposed such that Wren would not pose a danger to the community."); *United States v. Gardner*, No. 14-CR-20735-001, 2020 U.S. Dist. LEXIS 129160, at *20 (E.D. Mich. July 22, 2020) ("There is no reason for the Court to assume that Mr. Gardner presents a greater danger now, six years after the offense and following service of a prison sentence, than he did when he was released on bond."); *United States v. Locke*, No. CR18-0132 RAJ, 2020 U.S. Dist. LEXIS 102592, at *14 (W.D. Wash. June 11, 2020) ("The concern for Mr.

Locke being a danger to the community was significantly mitigated based upon his performance on pretrial supervision.")

Furthermore, the punitive nature of Barnes' sentence has increased significantly due to COVID-19 and the resulting months long lockdowns. *United States v. Lopez*, 2020 U.S. Dist. LEXIS 106989, at *10 (S.D.N.Y. June 15, 2020) ("Since the inception of the pandemic, the punitive aspects of prison life have skyrocketed and the rehabilitative opportunities have been severely diminished.").[10]

Barnes has stayed out of trouble, remained active, and done everything this Court and society would want of an incarcerated man. Supervised release and home confinement can also further the goals of rehabilitation and mitigate against concerns that Barnes needs more rehabilitation. And in doing so, the Court can take comfort that Barnes as protective factors. He has a loving wife and a home to return to and protect himself from the virus. He also notes that he has job opportunities available from Kenneth Wilson at Special Multi Services or with Stacey Oak from the City of Detroit Administrative Services. Both of these individuals contact information is

---

[10] *See also*, *United States v. Hooker*, 2020 U.S. Dist. LEXIS 141626, at *19-20 (S.D.N.Y. Aug. 3, 2020) ("Inmates are subject to far greater restrictions on their ability to move around and engage in positive programming, while . . . terrified of contracting the virus, and terrified of each other . . . Mr. Hooker's incarcerative experience has been highly punitive"); *United States v. Cummings*, No. 12-CR-445-14 (JMF), 2020 U.S. Dist. LEXIS 103931, at *3 (S.D.N.Y. June 10, 2020) ("For one thing, the conditions of Cummings's confinement — which have included varying degrees of lock downs, — have been far harsher than the Court had reason to believe they would be when imposing [its sentence]").

available with the undersigned counsel for this Court or probation's use. There are no frontline workers in the home and Barnes intends to follow any instructions of the Court, as he proved on bond facing such a high sentence.

On balance, the question becomes whether the need for punishment with additional incarceration justify the risk of serious illness or death. Given that Barnes has shown progress, and given that supervised release conditions can continue that rehabilitative progress, the punitive desires of the government should not put Barnes' life at risk. We ask the Court for compassion.

**C. The Government is Wrong about *Jones*.**

The government indicated to the Court that the Sixth Circuit's decision in *United States v. Jones,* ___ F.3d ___, No. 20-3701 (6th Cir. Nov. 20, 2020) should not affect the analysis or result of Barnes' case. The government argues that *Jones'* conclusion "that USSG §1B1.13 is not an 'applicable' policy statement for [] compassionate release motions" is merely dicta and not binding on this Court. The government also argues that even if the Court follows *Jones,* it should still be guided by USSG §1B1.13 in determining what is constitutes an "extraordinary and compelling" circumstances warranting compassionate release. The government is wrong.

The *Jones* Court's conclusion was *not* dicta. *Dictum*, or dicta, is a "judicial comment made while delivering a judicial opinion, but one that is unnecessary to the

decision in the case and therefore not precedential (although it may be considered persuasive)." *Richmond v Nichols*, 811 F.3d 192 (2016), citing Black's Law Dictionary (10th ed.2014). The Sixth Circuit devoted more than half of the majority opinion to the issue of whether USSG §1B1.13 applied in inmate-initiated compassionate release motions – the answer was it did not. In so doing, the Sixth Circuit *affirmed* the district court's decision to *skip* any analysis under USSG §1B1.13. Precisely stated, the Court held:

> [T]he judge did not refer to U.S.S.G. § 1B1.13 in his discussion of extraordinary-and-compelling finding; by doing so, the court skipped the second step. The question thus becomes: did the district court improperly refuse to consider § 1B1.13 per the second step of § 3582(c)(1)(A)'s test? As we now explain, § 1B1.13 does not "appl[y]" to cases where an imprisoned person files a motion for compassionate release. Thus, the judge's omission of reference to § 1B1.13 was proper.

*Id.* at 12. The usual "unmistakable language of dicta" is "[e]ven if we were to ...." followed by additional superfluous analysis. *Taylor v Simpson,* 972 F.3d 776 (6th Cir 2020) (reversed en banc). Such is not present here because the holding was necessary to affirming the district court. Had the Court found the district court should not have skipped analysis under § 1B1.13, then the district court necessarily would have erred. Whether such an error qualifies as harmless is an entirely different analysis from whether the Court's central holding was dicta. It was not. The Court was asked

to resolve whether the district court erred in its compassionate release analysis. It did not because it properly skipped § 1B1.13. That is a consequential holding.

But even if it was dicta, the government's insistence that this Court must still consider § 1B1.13 is not consistent with *Jones*. The Sixth Circuit's mandate, or at a minimum, its signaled mandate, could not be clearer: "In cases where incarcerated persons file motions for compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13." This Court should not take the government's invitation to view § 1B1.13 as continuing "to 'provide a working definition of extraordinary and compelling.'" ECF No. 108 at Page.ID 719. It does not.

Respectfully Submitted,

Date: December 28, 2020                    WADE FINK LAW P.C.

                                           /s/ Wade G. Fink
                                           Wade G. Fink (P78751)
                                           370 E. Maple Rd., Third Floor
                                           Birmingham, MI 48009
                                           wade@wadefinklaw.com

## **PROOF OF SERVICE**

I hereby certify that on December 28, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

/s/ Wade G. Fink
Wade G. Fink (P78751)
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
248-712-1054
wade@wadefinklaw.com